FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUN 17 2004

DAVID J. MALAND, CLERK
BY
DEPUTY

# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

DIRECTV, INC. §
§
V. § CASE NO. 4:03CV201
§ (Judge Schell/Judge Bush)
BARRY LUTHER, ET AL. §

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Barry Luther's Motion for Summary Judgment and Motion to Dismiss. Plaintiff, Directv(Direct), filed this instant complaint against Luther and others alleging violations of 47 U.S.C. § 605(e)(3)(C); 18 U.S.C. § 2511; 18 U.S.C. § 2512; 47 U.S.C. § 605(e)(4); civil conversion; and Tex. Civ. Prac. and Remedies Code § 123.001. All of Direct's complaints center around what it contends is the unauthorized interception of its satellite programming by Luther.

According to the pleadings filed in this Court in this case as well as other cases, Direct is a direct-to-home satellite services company. Direct transmits its programming from ground locations to its six satellites in geosynchronous orbit around the earth. Programming is then transmitted in the form of encrypted radio signals from the six satellites back to subscribers on planet earth. In order to receive transmissions from outer space, subscribers are required to utilize a set of equipment commonly referred to as a DIRECTV system. The system consists of a DIRECTV-compatible satellite dish, a receiver, access card, television set and cable to connect the components together. The receiver is also known as an "integrated receiver/decoder" or IRD. The IRD is a device placed near a television set that displays programming. Signals from a

1

satellite are received via the compatible satellite dish and transmitted via cable to the IRD. The IRD then processes and decrypts the incoming signals with assistance from an access card inserted into the IRD. Once decrypted, the signals are then transmitted from the IRD via cable to the television set where the subscriber can enjoy the program of his or her choice. An authorized access card allows only those channels which have been subscribed to or purchased by the viewer to be decrypted and provided for viewing. It appears, although not specifically pointed out, that each subscriber must pay a basic rate for a specific number of channels and programming. Higher rates will allow the customer to select from a greater variety of programming and entertainment.

    Direct contends that because it has acquired such a complete lineup of quality programming, individuals go to great lengths to circumvent Direct's encryption and security devices. This practice, according to Direct, is signal piracy and the individuals who stand accused will be referred to as "pirates." It is Direct's concerted action to haul these pirates before the mast to answer for their misdeeds. According to Direct, these twenty-first century pirates have purchased illegally altered access cards or other devices to "surreptitiously intercept" Direct's programming. In fact, the Complaint states that there has been a surreptitious possession and use of illegal devices to intercept and decrypt Directv's protected satellite communications. Allegations as to actual interception are made on information and belief. In fact, one is branded a pirate by the receipt of devices that Direct contends are used primarily for interception. However, the devices can also be used for other purposes, but the mere receipt, in the opinion of Direct, is evidence of satellite piracy. Since Luther purchased a MK2 Unlooper-WTX device, Direct contends he is a pirate for there is no other reason for which he would have purchased the device.

2

To be entitled to summary judgment, the movant must either prove there is no genuine issue of material fact and that it is entitled to judgment as a matter of law or show that there is no evidence to support the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court is charged with viewing the evidence and inferences in the light most favorable to the non-movant; however, the resisting party may not rest on its allegations or unsubstantiated assertions. *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991). The non-movant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). For circumstantial evidence to be sufficient to allow the non-movant to withstand summary judgment, the evidence must be more than that which might "raise some eyebrows." *See Coffey v. Cox*, 218 F.Supp.2d 997 (C.D. Ill. 2002).

Mr. Luther has filed an affidavit under oath. Luther states that he has been employed for 15 years in the computer industry. He states that he has used "smart cards" in developing applications for clients. The term smart card is intended to mean a credit card sized electronic device complying with the International Organization for Standardization protocol 7816 or "ISO 7816." Luther purchased the device so he could experiment with smart card technology. He did not attempt to program the card or otherwise use the microcontroller before the device ceased to function. In fact, it ceased to operate shortly after he purchased it. He states that the device was limited to using its read/write capabilities to communicate with various non-Directv smart cards.

3

Essentially, Luther states that he never used the card to attempt to intercept or intercept Directv's satellite signals and has been a subscriber of Direct's quality programming for almost 10 years in spite of being branded as a pirate or even worse. For the reasons expressed herein, the Court finds that the allegations against Mr. Luther are totally without merit.

Direct asserts that Luther's "it was for research" defense is a question of fact for the jury. Direct asserts the following facts which, in its opinion, should warrant a denial of summary judgment. First, there is an admission that he purchased the device. The Court agrees there is an admission and a believable and sworn statement as to why the device was purchased, i.e. for a perfectly valid purpose. Direct's argument that every device purchased raises an issue of interception is akin to arguing that all guns purchased raises the inference of intent to commit murder. The Court finds Direct's leap in logic to be illogical. Direct has also attached an affidavit from an officer of Fulfillment Plus which evidently shipped the "pirate device" as coined by Direct. However, the affidavit references a packing slip that evidently denotes shipment to a one Johnny Knight somewhere in Arizona. A shipment of a device that is not even remotely similar to the one possessed by Luther. Therefore, the Court gives no credence to Exhibit A. Next, Direct argues that the device purchased does not comply with ISO standards but, in fact, violates certain protocols. The expert retained by Direct states that the unlooper purchased is merely designed to circumvent the Directv access system. The affidavit of Gatliff addresses the unlooper device. First, he acknowledges that unloopers originally got their name from their ability to stop the endless loop created by some ECM's. He states that the same hardware *can also be used* to circumvent Direct's access system. He also states that all unloopers include specific electronic components whose sole function is to manipulate the power supply and clock

4

signals supplied to a smart card which is often referred to as *glitching*. He states that this activity is not required nor recommended by any ISO7816 standard or other smart card technology. His examination of the unlooper *apparently purchased* by Luther indicates that the device is designed around an Atmel chip. *In addition to other capabilities,* he states that the chip can store the software it will run in a nonvolatile memory contained on the chip. His opinion is that the design and use of the MK2 unlooper and WTX firmware is to circumvent Direct's programming access controls. His opinion is that there is no commercially significant purpose other than to modify Direct's access cards. Nowhere does he state an opinion that the unlooper is designed to assist in the interception of satellite signals. The Court is left to infer that modification of an access card allows unlawful interception.

There are strong facts which tend to negate Direct's arguments. First, Luther was a long time subscriber. Directv has attached his billing records and the response does not point out any discrepancy in his choice of viewing. In fact, it appears from the records that he spent over $4,000 during the period he has been a subscriber. Direct fails to demonstrate how these records point to the circumstantial proof of piracy. If anything, the records demonstrate the opposite. The man paid for programming and then was sued for piracy. Direct does not argue that the records attached demonstrate a fact issue as to piracy. According to the records attached, it appears that Luther paid more for programming as time passed even after the claimed purchase of the unlooper device. This fact seems to have been ignored by the Plaintiff. If the opposite had been demonstrated, Plaintiff, given its past conduct, would have highlighted the decline in subscription rates. Direct also attached the entire deposition of Luther. Without bothering to highlight what portions are relevant to the response, the Court was left with the task of reading

the entire deposition since Direct contends that the deposition supports its position.

Direct makes the unsubstantiated and false assertion that Luther admits that he gave, sold or otherwise distributed the *devices* to a third party. There is no evidence in the record anywhere that this occurred. The Court finds that this statement is blatantly false and irresponsible. Next, Direct makes the assertion that when requested to provide names of people to substantiate Luther's claim of research into "smart card" technology, Luther declined to do so. Direct cites pages 42-43 of the deposition. However, this is completely false. What Luther was requested to do was to provide a list of contractors who had worked with smart card technology. Luther stated he could not remember off the top of his head but his lawyer agreed to do so with a protective order so as not to disclose the names of clients of Luther's company. Direct's lawyer acquiesced in this most reasonable response. To characterize Luther's testimony as somehow deceptive is patently misleading. The Court believes this sanctionable conduct on the part of Direct is indicative of the merits of its case before the Court and these false statements, standing alone, are enough, in the Court's opinion, to grant summary judgment for the Defendant.

Nonetheless, Luther, in his deposition, states that he was a subscriber for a number of years. Prior to the purchase of this device, he testified that the records indicated that he had cancelled Pay-for-View rights. However, he also testified that he never knew he had the Pay-for-View option and that it would not work anyway because he had no telephone connections in the rooms where the receivers were located. This made it physically impossible to use the option even if it were given to him free. If he had total programming anyway and could not use Pay-for-View, was the unlooper really purchased to intercept signals he had a right to receive? Of course, Direct's hired expert addressed none of these issues. In the midst of all this questionable conduct

6

on the part of Direct, the Court will address the issues presented.

Direct has sued under the provisions of 47 U.S.C. § 605 (e)(3)(A). This section permits an aggrieved party, as defined in 605(d)(6), to obtain civil relief in the form of actual damages or statutory damages. 47 U.S.C. § 605(a) contains certain prohibitions concerning radio communications. The section provides that no person shall receive radio communications for his own benefit if he is not entitled to receive such communications. The section also prohibits anyone who knows that a radio communication is intercepted from divulging its contents or use such communication for his own benefit. 47 U.S.C. § 153 defines radio communication as a transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding and delivery of communications) incidental to such transmission. Although not statutorily defined, the question is whether satellite communications are within the definition of radio communications. Courts have held that satellite communications as well as TV signals are radio communications. *Home Box Office, Inc. v. Corinth Motel, Inc.*, 647 F.Supp. 1186 (N.D. Miss. 1986); *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub Inc.*, 146 F.Supp.2d 955 (E.D. Wis. 2001). Section 605(e)(3)(A) allows an aggrieved party to bring a suit for civil damages. Section 605(d) defines "any person aggrieved" as including "any person with proprietary rights in the intercepted communication by wire or radio,……." To have standing and to assert jurisdiction, Direct must be an aggrieved party. An aggrieved party must have an interest in a communication which is intercepted. Although not defined in § 605, interception is defined in 18 U.S.C. § 2510(4) as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device." Electronic

7

communication includes radio transmission. 18 U.S.C. § 2510 (12).

Section 605 gives an aggrieved party two opportunities to recover damages. Section 605(e)(3)(A) provides for the recovery of actual damages for violations of subsection (a) or paragraph (4) of the section. Can a valid subscriber authorized to receive signals also be a pirate? The Court assumes that Direct's argument is that although Mr. Luther was a long and faithful subscriber who paid his monthly bills in a timely fashion, he watched more than he was supposed to watch without paying for the service. Without resolving the issue, the Court notes that Direct has significant hurdles in proving its case. First, it may sue for actual damages as well as the loss of profits. However, there is no evidence that Direct sustained any actual damages or loss of profits. Therefore, it cannot recover under § 605(e)(C)(i)(I). Therefore, Direct may recover only under § 605(e)(C)(i)(II), if at all. Direct's only option is to recover for statutory damages for each violation of subsection (a) or paragraph (4). However, to recover, it must show actual interception under subsection (a). There is no evidence that Luther ever intercepted any satellite transmissions. The fact that he had the opportunity is wholly deficient to sustain an award for actual damages. Therefore, the last recourse available to Directv is paragraph (4).

Paragraph (4) provides for criminal penalties for any person who *manufacturers, assembles, modifies, imports, exports, sells, or distributes* any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of direct-to-home satellite services. Direct pleads that Luther programmed or reprogrammed access card devices to be inserted into authorized Direct receivers. However, there is no direct evidence that he ever did so and the only direct evidence is his sworn affidavit and deposition which state he did not. There is simply no evidence that he

8

manufactured any device; nor assembled any device; nor modified any device; nor imported or exported any device. The Court disagrees with Direct's statement that the purchase of a device in interstate commerce amounts to importation. Direct states that because the device, in the words of its hired expert, is designed to intercept its programming, there is a fact issue. The Court disagrees. Paragraph (4) deals with conduct of merchants in the pirate trade, not necessarily the ultimate end users. Perhaps Direct could argue that an individual end user could be liable for modification of equipment. However, the penalties and remedies established for a violation of this chapter apply to each device so modified, etc. Mere possession cannot rise to a finding of modification. It all boils down to this argument. For the Defendant, I did not do it. For the Plaintiff, but you could have done it with the device purchased. In this case, the Plaintiff cannot overcome Defendant's motion. Luther further stated that he knew that the devices could be used to pirate signals, but that he did not know how to do so and had no interest in doing so. The Court finds that the only believable witness is Luther.

18 U.S.C. § 2511 proscribes the intentional interception or attempted interception of any electronic communication. 18 U.S.C. § 2510(12) defines such communications, in part, as a transfer of signals by radio which, as noted above, includes satellite transmissions. 18 U.S.C. § 2520(a) provides for civil relief for a person whose electronic communication is intercepted. However, for the reasons expressed herein, since there is no evidence of interception, there can be no violation.

18 U.S.C. § 2512 makes it unlawful for any person to intentionally manufacture, assemble, possess or sell any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious

interception of wire, oral or electronic communications. There is no specific provision for a right to bring a civil action under the referenced statute. Here, Direct contends that 18 U.S.C. § 2520(a) provides a right for civil relief for a violation of 18 U.S.C. § 2512. § 2520(a) provides civil relief for any person whose wire, oral or electronic communication is *intercepted, disclosed, or intentionally used* in violation of this chapter. In many cases, Direct has agreed that § 2512 does not provide a civil relief for mere possession. Lately, Direct has not sued on this ground. The Court is at a loss to understand why Direct has not seen the light of reason as to this case.

Even within the districts in Texas, there is a difference in opinion as to whether § 2512 allows a private cause of action for mere possession. These cases were cited in the Court's Report and Recommendation in Case No. 4:03-CV-98. No objections were filed as to the Court's conclusion that § 2512 does not authorize a private cause of action for mere possession. As stated previously, the language of the statute is plain and simple. In interpreting a statute, the starting point is the language of the statute itself. *Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir. 1993). A recent decision provides a succinct analysis of the various decisions across the country in determining whether or not a private cause of action exists under § 2512.   *See generally Directv, Inc. v. Boggess*, 300 F.Supp.2d 444 (S.D. W.Va. 2004). Judge Howell Cobb has settled this question in this district. *See Directv, Inc. v. Alberts*, No. 1:03-CV-161 (E.D.Tex. 2003). There is no private cause of action under § 2512. The Court also notes that Direct constantly cites only cases favorable to it while failing to cite cases to the contrary even within this District. The Court does not approve of this conduct and reminds Direct of its duty of candor to the Court.

Direct's claims for civil conversion and violations of the Tex. Civ. Prac. and Remedies Code Chapter 123 also fail in that there has been no showing of an attempted or actual

interception. Further, there has been no showing of actual theft of property to warrant a finding of conversion. *See generally P & T Mfg. Co., Inc. v. Exchange Sav. and Loan Ass'n.*, 633 S.W.2d 332 (Tex. App. – Dallas 1982, *writ ref'd n.r.e.*).

There is no direct evidence that Luther ever attempted to intercept or intercepted Direct's signals. Several cases out of the Western District of Michigan have concluded that circumstantial evidence can defeat a motion for summary judgment in these type of cases. However, in *Directv, Inc. v. Brower*, 303 F.Supp.2d 856, 863 (W.D. Mich. 2004), the Court notes that the "pirate" confessed to purchasing a device to intercept signals, but twenty-first century technology left him in the dark. The Court also noted that Direct had pointed out discrepancies in the billing records which would indicate interception. There is no confession or billing discrepancies in the case before the Court.

In light of all the factors before the Court, the Court finds that Direct has failed in its duty to be candid with the Court, has deliberately made statements which were unsubstantiated and false, has taken a position which it acknowledges to be erroneous in other cases, and has persisted in pursuing a case for which it had no legitimate grounds to bring.

It is, therefore, recommended that Luther's Motion for Summary Judgment should be granted. All other Motions are denied as moot.

## RECOMMENDATION

Based upon the foregoing, it is the Court's recommendation that Luther's Motion for Summary Judgment should be GRANTED and the Plaintiff's case as to Luther should be DISMISSED WITH PREJUDICE.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and

file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

SIGNED this 17th day of June, 2004.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DIRECTV, INC. | § | |
| | § | |
| V. | § | CASE NO. 4:03CV201 |
| | § | (Judge Schell/Judge Bush) |
| BARRY LUTHER, ET AL. | § | |

## ORDER

Consistent with the Report and Recommendation entered in this case on this date, it is hereby

**ORDERED** that a corporate representative for the Plaintiff as well as counsel for the Plaintiff, Reginald B. Smith of Smith & Richardson and counsel from Greer, Herz & Adams, L.L.P., and counsel for Defendant Barry Luther, Daniel M. Burns, shall appear for a hearing on *Thursday, June 24, 2004 at 1:30 p.m.* at the Grayson County Courthouse, East Courtroom, 100 Houston Street, Sherman, Texas 75090 and show cause why sanctions should not be imposed.

SIGNED this 17 day of June, 2004.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE